*641 OPINION OF THE COURT
Sabrina B. Kraus, J.
Background
This summary holdover proceeding was commenced by Aimee Levine against Kathleen McDonnell, seeking to recover possession of apartment 4 at 236 Mulberry Street, New York, New York 10003 (subject premises)* based on the allegation that respondent was petitioner’s licensee and the license had since been terminated. Petitioner is the rent-stabilized tenant of record and currently resides in apartment 5 in the subject building. Petitioner asserts she is entitled to maintain both rent-stabilized apartments as her primary residence. Respondent has asserted a claim of illusory tenancy in her answer. Petitioner failed to establish a prima facie case at trial. In particular, it is clear that petitioner’s claim that respondent was a licensee is pure fiction. It is undisputed that petitioner sublet the subject premises to respondent and charged her rent for same. At a minimum then, respondent would have been a month-to-month tenant. However, it is clear to the court, as evidenced by statements by counsel on the record, that both parties are seeking a determination on respondent’s illusory tenancy claim, and that respondent does not seek a dismissal on procedural or technical grounds.
Procedural History
Petitioner issued a notice to quit dated January 26, 2011, terminating respondent’s right to occupy as of February 28, 2011. The petition is dated March 17, 2011. Respondent appeared through counsel, and filed an answer on the initial return date, March 31, 2011. On July 13, 2011, the proceeding was marked off the calendar, pending a determination of summary judgment motions in a related Civil Court proceeding.
The case was restored to the calendar for motion practice in January 2012. On November 27, 2012, the proceeding was assigned to part R for trial and the trial commenced. The trial continued on November 28, and was adjourned to January 8, 2013, when it concluded. The proceeding was adjourned to February 22, 2013 for the submission of posttrial memoranda, and the court reserved decision.
*642 Findings of Fact
Petitioner is the tenant of record of the subject premises pursuant to a lease dated January 15, 2000 for a period covering February 1, 2000 through January 31, 2001 (exhibit 1). That lease was most recently renewed in 2012 for a period through July 31, 2013.
Petitioner became the tenant of record for the subject premises pursuant to a lease executed January 15, 2000, for a term expiring January 31, 2001. The lease does not set forth the rent for the subject premises, and provides that the subject premises was occupied at that time, and that if the occupants failed to surrender by January 31, 2000 the lease was to be null and void. The lease was renewed for a two-year period through January 31, 2003 at a rent of $523.50 per month. The lease was most recently renewed pursuant to a renewal dated April 19, 2012, for a period through July 31, 2013 at a rental of $743.58 per month.
Immediately upon becoming the tenant of record, petitioner sublet the subject premises to Tamara H. Marotta and Rich Marotta, who stayed for a period of six months and paid petitioner rent at a rate of $475 per month. Initially, petitioner testified that these subtenants were put into the subject premises by the landlord, and she had no part in agreeing to rent to them. However, later she testified that the landlord sent the couple to her and she executed a sublease agreement with them. The sublease, and initial payments for rent and security are in evidence (exhibit 22). The sublease ran through June 30, 2000. During this period, the Marottas had exclusive possession of the subject premises.
After the Marottas moved out, petitioner temporarily relocated to the subject premises while she renovated apartment 5. This was in 2001. Petitioner testified that the renovations were done with notice and consent to the landlord, and that she spent approximately $5,000 on renovations, which included installation of a new kitchen and new wood floors. Petitioner testified that she invested this sum, even though she wasn’t the tenant of record, because she had the expectation that she would be able to continue to rent for a long time. Petitioner stated that even though the landlord nominally claimed apartment 5 was his daughter’s apartment, the landlord’s wife would roll her eyes as a sign to petitioner that this was a fallacy, and that the landlord’s daughter was never really coming back (if indeed she was ever there to begin with).
*643 Petitioner never slept in the subject premises on a regular basis, other than a short period of time when she slept there temporarily while renovating apartment 5. By mid-2001, petitioner was exclusively sleeping and eating in apartment 5 and alleged she used the subject premises as a photography studio and as office space.
Petitioner then sublet the subject premises to Andrew Gamble for approximately one year, in 2002, at a rent of $475 per month.
In 2005, petitioner rented the subject premises to Alan Jennings at a rental of $650 per month. The rent petitioner paid the landlord for the subject premises at the time was $514 per month. Petitioner acknowledged that prior to renting to Jennings, she had sublet to a number of other people, who also paid petitioner to stay in the subject premises, although for the most part petitioner testified, not credibly, that she could not recall who, how long they stayed, or what they paid.
Petitioner sublet the subject premises to respondent in October 2005. Respondent had heard the apartment was available through a friend who knew Jennings, petitioner’s subtenant at that time. Respondent called petitioner and made an appointment to see the subject premises. When respondent went for the showing, Jennings greeted her and later petitioner joined them. Petitioner told respondent she was showing the subject premises to at least one additional prospective subtenant, and that she would get back to respondent about renting. Soon after, petitioner called respondent and agreed to sublet the subject premises to respondent.
When respondent moved in, the subject premises was partially furnished. However, respondent repeatedly sought to have petitioner remove many of the items, and over time most of petitioner’s belongings were moved out, and respondent put in more of her own possessions and furniture. Petitioner did not consider the rental to respondent to include any surcharge for furnishings. In an email dated November 30, 2007, petitioner stated she had “lent” these items to respondent and complained about the wear and tear on them as a result (exhibit 10).
Respondent was initially told Jennings might return after six months, and that the sublet might be limited to a six-month period. Respondent paid petitioner $800 per month through April 2008. Petitioner told respondent the rent was set at $800, rather than the $650 she had been charging Jennings, so that petitioner would have a cushion to cover any months when the subject premises was not occupied. There was never any written *644 agreement between petitioner and respondent. Since October 2005, respondent has had exclusive use of the subject premises.
After two years, respondent was having financial difficulties and asked if petitioner could lower the rent based on respondent’s assumption that petitioner had collected enough of a “cushion” to cover any potential gaps in occupancy. Petitioner did not agree to lower the rent and told respondent she thought it was a “fair” rent for the neighborhood.
Petitioner is also the tenant of record of apartment 5 at the subject building, which is on the same floor, but not contiguous to the subject premises. Petitioner first rented the apartment pursuant to a sublease agreement which was issued by Karin A. Weiss, who was listed as the “overtenant” and AL Weiss was listed as the landlord. The sublease was dated February 4, 1995, and ran through a term of August 31, 1995, at a rent of $345 per month. These “subleases” continued to be executed by petitioner and Karin Weiss through January 2010 (exhibit 4) with the last rent being $598.35. Karin Weiss is the daughter of the landlord AL Weiss, and although her address for notices was in California, she was listed as the tenant of record of apartment 5 through January 2010.
On July 15, 2009, well over a decade after she first rented apartment 5, petitioner was given a rent-stabilized lease for apartment 5, for a term running through July 31, 2011, at a rent of $559.82. The portion of the vacancy lease that should provide how the regulated rent was calculated is blank. That lease was most recently renewed for a period through July 31, 2013 at a rent of $585.01 per month (exhibits 3a, 3b).
Petitioner was thus recognized as the tenant of record for the subject premises well before she was accorded that right in apartment 5.
Petitioner testified that she used apartment 5 as her legal office from the mid-90s until 2006. There is nothing in the record regarding the rent registrations for apartment 5. The subject premises was not registered until 2000. In 2000, an initial 1984 registration was filed listing petitioner as the tenant of record at a rent of $82.10. No registrations were filed for the years 1985 through 1999, and in 2000 petitioner is listed as the tenant of record at a legal rent of $475 (exhibit A). Based on all evidence in the record, the information on the 1984 registration was fabricated.
Petitioner asked respondent to move out in April 2008, and at respondent’s request, petitioner lowered respondent’s rent in *645 May 2008 to $650 per month, which respondent paid through April 2009. In September 2008, respondent advised petitioner she could not afford to move out.
In March 2009, respondent retained counsel, who wrote to petitioner and asserted a claim of overcharge and illusory tenancy (exhibit 23). Petitioner retained counsel who served respondent with a 30-day notice of termination dated August 11, 2009 (exhibit 5a-5c). Respondent then sued petitioner for rent overcharge in Civil Court. Respondent, through counsel, also sent the owner of the subject building a request for a lease to be issued in respondent’s name on September 29, 2009 (exhibit 25).
Petitioner testified that the landlord was aware that she had sublet to respondent and had no objection to the sublet. Petitioner took no further action to evict respondent until June 2010 when a new 30-day notice was issued (exhibit 27). No proceeding was ever commenced based on this notice.
In 2010, the landlord had commenced an illegal sublet proceeding against petitioner and respondent under index No. 56575/2010. The proceeding was discontinued pursuant to a stipulation dated May 24, 2010 (exhibit 8). Pursuant to said stipulation respondent released the owner of the building from any liability in exchange for payment of $2,804.65. The stipulation further provided that the owner “shall be bound by any final judicial or administrative determination or settlement with respect to the tenancy rights of either Aimee P Levine or Kathleen McDonnell with respect to the subject premises.”
Discussion
“The term ‘illusory tenant’ has been used to describe a party who, while assuming the guise of a ‘prime tenant’, enters into a sublease arrangement which has the effect, directly or indirectly, of evading the requirements of the Rent Stabilization Law. In such case, the subtenant will be accorded the full protection of the rent stabilization laws.” (Matter of Avon Furniture Leasing v Popolizio, 116 AD2d 280, 284 [1986].)
The courts have set forth several relevant factors to be considered in whether a finding of illusory tenancy is appropriate including collusion with the landlord and whether the landlord had knowledge of the subletting (id.), prior occupancy by the tenant, the intent of the tenant to resume occupancy, the *646 degree of control exercised by the tenant over the subject premises, the expectations of the subtenant regarding remaining in occupancy, and whether there was an overcharge and profit (Bruenn v Cole, 165 AD2d 443 [1991]).
In evaluating a claim of illusory tenancy, the court must determine whether petitioner sublet the subject premises to respondent with the intent of depriving respondent of rights under rent stabilization and the intent to make money. The court finds that respondent has established these factors exist in the case at bar.
Mr. Weiss, the former owner, was clearly intent on evading rent stabilization laws. This is evidenced by the fact that the subject premises was not registered with the Division of Housing and Community Renewal until recently, and also by petitioner’s tenancy in apartment 5. Petitioner “sublet” apartment 5 for years, while Mr. Weiss alleged his daughter was the tenant of record. Petitioner, an attorney, went along with the landlord in this regard, and as a reward was given a second rent-stabilized apartment in the subject building. Petitioner was so secure in her knowledge that she had a long-term interest in apartment 5, without it being in her name, that she spent money and did her own renovations on the apartment. Petitioner acted collusively with the landlord to evade rent stabilization requirements, and in exchange she was given a lease for the subject premises despite the fact that she was already residing in another rent-stabilized apartment in the same building. The landlord was not only aware of petitioner’s intention to sublet the subject premises, but he also sent her the first subtenants.
This cooperation between petitioner and the landlord continued with the new owner, as evidenced by the stipulation entered between petitioner and the landlord in the illegal sublet proceeding commenced by the landlord under index No. 56575/2010. The stipulation provides that the landlord agrees not to commence a nonprimary residence holdover proceeding against petitioner with respect to either the subject premises or apartment 5 in the building, unless Levine does not maintain either one as her primary residence and has established a primary residence somewhere else. This agreement appears to contradict the rent stabilization laws and be void as a matter of law (390 W. End Assoc. v Baron, 274 AD2d 330 [2000]). Moreover, the landlord agreed to extend petitioner’s lease for the subject premises, without any applicable increase, for six months, so that the leases for the two apartments would run together and *647 to buttress petitioner’s claim of using both apartments as one primary residence.
While petitioner asserts she intends to use the subject premises as a primary residence with the apartment she now occupies, she has not done so to date. Petitioner used the subject premises as an office and a photography studio, but primarily as a rental to house others.
Petitioner has submitted numerous documents in evidence, including tax returns (exhibit 16), some of which list the subject premises as her primary residence. Petitioner acknowledged at trial that she claimed the rent for the subject premises as a business expense on her tax returns. Petitioner testified, not credibly, that she didn’t recall for what years this applied. Although the returns are largely redacted, included in these documents are petitioner’s 2004 and 2005 unincorporated business tax returns, in which she lists the subject premises as her business address, but the business telephone number is redacted.
Petitioner’s 2006 and 2008 tax returns list her home address as apartment 1 in the subject building. It is unclear if she has a third apartment in the subject building, or if there is another explanation for this. It was not addressed by either party at trial.
Particularly telling of petitioner’s lack of future intention to occupy the subject premises as her primary residence when she rented it to respondent, is respondent’s credible testimony that petitioner explained the high amount of rent initially charged as being necessary to cover any future gaps of time where petitioner would be unable to rent it out. Petitioner’s testimony that she was not looking to rent the subject premises to anyone at the time she rented to respondent was not credible, and is belied by respondent’s testimony that prior to agreeing to rent the subject premises to respondent, petitioner stated she first needed to show it to another prospective subtenant. To the extent that the two parties’ testimony on these points differed, the court found respondent’s testimony to be credible, and petitioner’s testimony to be lacking in credibility.
Similarly, in an email to respondent dated April 22, 2008, petitioner admitted that she had no specific intention regarding occupying the subject premises in the future. Petitioner stated “I was not sure what my needs in the future would be (Ex 10).”
It is clear that petitioner overcharged respondent for rent. From October 2005 through January 2007 petitioner paid the landlord $579.29 per month for the subject premises. From *648 October 2005 until April 2008 petitioner collected $800 per month from respondent for the subject premises. From February 2007 through January 2009 petitioner paid the landlord $620.93 per month for rent, and collected $650 per month for rent from respondent for May 2008 through April 2009.
Respondent clearly did not have the belief that she was entitled to remain in the subject premises on a long-term basis, but that alone is insufficient to deny her illusory tenancy claim. Factors enumerated by the courts as indicia of an illusory tenancy are relevant, but no single factor is determinative (Bruenn v Cole, 165 AD2d 443, 447 [1991]).
“The rent stabilization laws were enacted to meet a serious housing shortage and to protect those who are able to afford only reasonable rents. . . . (Illusory) tenancies are condemned because they permit the unscrupulous to use the provisions of the rent stabilization laws for financial gain, at the expense of those entitled to the laws’ protections to obtain living quarters at reasonable cost, and thereby frustrate the laws’ purposes.” (Matter of Badem Bldgs. v Abrams, 70 NY2d 45, 52-53 [1987].)
“A tenant of a stabilized apartment who maintains a primary residence elsewhere, and also seeks to retain the stabilized apartment for convenience or for considerations of personal gain, is not one who is a victim of the housing crisis but may rather be said to be a contributing and exacerbating factor in the continuation of the critical shortage of affordable apartments.” (Briar Hill Apts. Co. v Teperman, 165 AD2d 519, 523 [1991].)
In this case, petitioner never primarily resided in the subject premises, rather she primarily sublet the subject premises, and perhaps occasionally used it for a law office, or storage. Respondent has primarily resided in the subject premises since she moved in and has no other home. The purposes of the rent stabilization laws would not be furthered by allowing respondent’s eviction so that petitioner could continue to have two rent-stabilized apartments in the same building, one in which she lives and the other which she would use for other purposes.
The court finds that petitioner’s tenancy in the subject premises is an illusory tenancy and that respondent is the true tenant entitled to the protection of the rent stabilization laws. Based on the foregoing the petition is dismissed.

 The petition describes the premises as both apartments 4 and 5, but counsel stipulated on the record on November 28 that apartment 4 is the only premises that is the subject of this proceeding, and the petition is deemed amended to reflect same.